UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

In re:

GARIC HAYES and MAE HAYES,

                                    Debtors.

_____

PETER BAUER and LEEANN BAUER,

                                    Plaintiffs,

      v.

GARIC HAYES and MAE HAYES,

                                    Defendants.

Bankruptcy Case No.  24-00086-GS
Chapter 7

Adversary Proc. No.  24-90005-GS

**MEMORANDUM DECISION AFTER TRIAL**

<u>Trial</u>
DATE:  February 24, 2025
TIME:  9:30 a.m.

     Plaintiffs Peter and LeeAnn Bauer contracted with Garic Hayes General Contractor LLC (GHGC) to build a custom house outside of Palmer, Alaska in the summer of 2021. Unfortunately, the project was fraught with problems and GHGC never completed the construction. The Bauers now claim that debtors Garic Hayes and his wife Mae Hayes fraudulently induced them to enter the construction contract and pay monies to GHGC. The Bauers claim that the Hayeses are liable for the resulting damages and those damages are excepted from the discharge under § 523(a)(2)(A). The parties tried the case to the court on February 24, 2025, and March 24, 2025.

     The Bauers' fraud claims come down to two material, disputed questions of fact. The first is whether the Hayeses fraudulently induced the Bauers to enter into the construction contract and make the initial deposit of $190,500. According to the Bauers, Garic and Mae caused GHGC

1

to enter into the contract without any intent to perform.[1] The second question is whether they fraudulently induced the Bauers to make an additional deposit specifically for the purpose of purchasing lumber, which was never purchased.

The court has carefully reviewed the testimony of the witnesses and the exhibits admitted at trial. Having considered the totality of the evidence, the court concludes that the Hayeses intended to perform GHGC's contractual obligations when it entered the contract. The second claim presents a closer question, but the court finds that the Bauers have not met their burden of proof that either Garic or Mae fraudulently induced them to provide additional funds to purchase lumber even though it was never purchased. The court will, therefore, enter judgment in favor of the Hayeses and deny the Bauers' sole claim for relief under § 523(a)(2)(A).[2]

**Facts**

### A.    Garic Hayes General Contractor LLC.

Garic started working in construction when he was 21 years old in a cabinet shop in Wasilla, Alaska. He then became an independent subcontractor doing interior trim carpentry and cabinetry in the area. For a while, he left construction to work in a restaurant in Anchorage before joining Byler Contracting as its general manager. Garic testified at trial that while working at Byler Contracting, he was responsible for every one of its projects over the five years he was there. Garic estimated that he was responsible for close to 1,000 construction projects, involving both residential and commercial projects.

Garic left Byler Contracting in 2017 and started GHGC in 2018.[3] He testified that his new company built its first home in Settlers Bay in May 2018 on speculation. He stated that the

---

[1] Due the number of individuals, and multiple family members, referenced in this decision, the court will generally use first names for clarity. No disrespect is intended.

[2] The Bauers' complaint also stated claims under § 523(a)(4) and (6), but the Bauers abandoned these claims at trial.

[3] The Hayeses submitted GHGC's federal tax returns into evidence at trial. GHGC's first tax return is for 2018 and stated that it was for the tax year beginning March 7, 2018. The court assumes GHGC is the construction company Garic started.

house sold for a profit and won multiple awards in the local Parade of Homes. Overall, prior to his bankruptcy he estimated that his company entered roughly 50 contracts. Of these, he believes that GHGC completed all but five of those contracts – which were among the last five outstanding when the business closed in 2023.

GHGC's tax returns offer some insight into its financial life. The reported numbers reflect a sharp growth in income with increasing costs as the Covid pandemic arrived:

| Tax Description | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Gross receipts or sale | $   685,482 | $   2,412,540 | $   2,451,244 | $   3,044,636 |
| Cost of goods and deductions | $ (407,627) | $ (1,894,233) | $ (1,577,261) | $ (2,816,458) |
| Total deductions | $ (221,393) | $   (384,950) | $   (730,639) | $   (371,621) |
| Net income | $     56,462 | $     133,357 | $     143,344 | $   (143,443) |
| Salaries and wages | $       4,380 | $       65,624 | $     139,040 | $                 - |

As reflected above, GHGC paid nominal salaries when it opened in 2018. As its income jumped over the next two years, it increased its salaries in 2019 and 2020, while still reporting positive net income for those two years. In 2021, however, no salaries were paid as GHGC's expenses overtook its income. It is unclear how much, if any, of the reported salaries in 2018-2020 were attributable to Garic.

### B.    The Bauers' contract.

In May 2021, during the Covid pandemic, the Bauers contacted Garic by email to inquire whether GHGC was available and able to build a custom home on land they owned in Palmer, Alaska. The Bauers had viewed a house during the 2019 Tour of Homes that the company had built and found it "endearing." The Bauers believed the house showed appealing features and artistic touches that made it feel special. The Bauers also viewed pictures of other houses the company had built and thought Garic and Mae had a good eye for taste and décor.

The Bauers engaged in preliminary discussions with Garic, Mae, and their representative Felicity Russell via email. Ms. Russell was a local realtor who worked for GHGC as the

transaction coordinator for the Bauers' house. During these early discussions, the Bauers advised GHGC that they would pay for the construction from their own funds rather than financing the project with a lender. The Bauers also forwarded "rough" draft design plans for their house, which they had been working on themselves. The Bauers were primarily concerned with finishing the plans and completing construction so they could move into their newly-built home by March 2022. At the beginning of June 2021, the Bauers forwarded images to GHGC prepared with Home Designer Pro software. Felicity advised the Bauers that GHGC worked with a drafter "so we can make all your design changes, additions, alterations, etc here, and that is not [an added] charge to you. You do not need to have finished plans to start with us."

Garic and Mae met the Bauers, in person, in late June 2021. Either at the meeting or shortly thereafter, they presented a construction contract for the Bauers' review. On June 29, 2021, the Bauers emailed the Hayeses questions about the contract seeking specifics as to a number of the contract provisions. The next day, Peter reached out to a realtor not involved in the transaction for a referral to a real estate attorney to review the contract. The realtor was unable to provide one and the Bauers proceeded without counsel.

On June 30, 2021, Mae responded by email to the Bauers' questions concerning the contract and costs. She stated that she had revised the draft contract in response to the Bauers' email to clarify it. She also attempted to respond to the Bauers' specific questions raised in the June 29, 2021 email. The parties exchanged further emails to coordinate execution of the contract and wiring of funds to GHGC. On July 1, 2021, the parties signed the contract and the Bauers wired GHGC an initial deposit of $190,500, representing 25% of the full contract price of $762,000.

The contract estimated that GHGC would complete the project within 250 days of the project commencement – which was to be triggered upon execution of the contract. But as the Bauers acknowledged, the Hayeses were clear that the estimated date of completion was subject to delays caused by subcontractors and other factors largely beyond their control. As all parties

4

later testified, everyone understood that progress on the project assumed the timely completion of the Bauers' design plans and approval of the final version of those plans. This never occurred.

### C. Drafting the plans.

Dirk Imlach was the draftsman GHGC used to prepare and finish the Bauers' design plans. At the time of the Bauers' project in 2021, Dirk had been working with Garic for roughly five years. He first began while Garic was employed by Byler Contracting as general manager and then continued with Garic when he started GHGC. Together, Dirk stated that he had worked with Garic on roughly 60 to 70 residential construction projects before the Bauers' house. Dirk also worked for several other contractors. According to Dirk, most of his design plans were completed within a month, though some projects could take two to three months. Dirk explained that he had books with preliminary plans available for home buyers to use, which could be modified and marked up as needed. Custom houses, however, required more iterations and more time to draft completed plans.

For the Bauers' project, Dirk drafted the first iteration of their design plans on July 8, 2021. GHGC's office manager and project coordinator, Erin Faes, emailed the documents to the Bauers on July 13, 2021, together with Dirk's contact information. Throughout the rest of July and August 2021, the Bauers worked directly with Dirk on several iterations of their plans. Dirk would send them new drafts and Peter would respond with questions, comments, concerns, and potential design refinements. During these early days of the project, emails between Peter, Dirk and various company representatives suggest that progress was slowed largely due to (1) Peter's careful review and revision of various design details; and (2) Peter's work schedule, which generally limited his time to review design plans to evenings and weekends.

An email exchange between Felicity and Peter dated August 3, 2021, is fairly representative of communications during this time. Felicity inquired whether the Bauers had been "able to get in touch with Dirk about finishing up your plans." Peter responded: "We are keenly aware that time is slipping by. Please don't be shy about letting us know if we're

bumping against any hard cut-off dates for construction." Felicity then replied: "Hello again, yes we are definitely getting nervous about timelines, we were hoping to have the foundation in already. If you guys can get plans wrapped up this week so we can have a final review and sign off by weeks [sic] end, that would be great." Likewise, as of August 12, 2021, Peter acknowledged in an email that he and his wife hoped to make a final decision that evening to choose from several variations of their home design plan. Peter sent a series of emails the next day to Garic, Felicity, and Dirk, showing that the Bauers evidently had settled on a single design variation, but numerous design details remained. Notwithstanding the delays, Peter expressed his optimism that he would be able to "hack away" at the remaining details throughout the upcoming weekend, and hoped to meet with Dirk "to finish the drawings" by Monday or Tuesday of the coming week.

Dirk testified at trial that he prepared a total of eight sets of plans for the Bauers, involving a total of 16 iterations of those plans. He was unaware of any other project that he had worked on that had more than five iterations of the plans. Dirk said there came a point when he became concerned that he was receiving potentially conflicting directions and he generally considered the Bauers to be harder to deal with than his average customer. Dirk testified that his seventh version of the plans were dated December 3, 2021, and he delivered the last set of plans on December 17, 2021. Dirk's plans were never finalized.

### D.    Amendment of the construction contract.

While the parties were modifying the plans, the Bauers emailed Garic on August 11, 2021:

> We're seeing local retail lumber prices continuing to come down as futures get better (now below $500). After iterating plans with Dirk, we think we need a few more sq ft and are hoping that reduced cost inputs to your spreadsheet might help us get across the finish line on the floor plan. Could you run the numbers below through your spreadsheet?

Garic responded to Peter the next day. He began by stating that he had "been keeping up with Dirk on the progress and metamorphosis of your plan." As to the request to add additional

6

square footage, Garic stated that because the physical construction on the house had not begun, he was willing to offer four options to the Bauers to amend the contract. These options allowed the Bauers to increase the square footage of the house but still reduce the total cost based on the lower lumber costs. Each option included decks and a garage, but the main floor ranged from 2,740 square feet to 3,350 square feet. Each option also included a basement with varying degrees of finished and unfinished space, and one included a "Jack-n-Jill" upstairs. The quoted lumber packages ranged from $118,300 to $131,900.  Garic explained that all the options – and reduced prices – were based on the Bauers making an additional deposit to "allow me to purchase the lumber from the supplier immediately and thus secure my position on the pricing."

On August 13, 2021, Peter emailed Dirk advising him about the change in the square footage for the house and forwarded two floor plans "that are identical EXCEPT for the additional bedroom area, which is INCOMPLETE in both of them." This email appears to contain the first reference to the drawings for the roof. Peter raised a concern "that the roof over a very wide rectangular deck spanning both the family and dining might lose the craftsman look…." Shortly afterwards, Peter followed up with Garic, advising "I just sent Dirk a couple of fairly detailed drawings, excepting we haven't quite nailed the jack-n-jill area. If he doesn't find too many big 'brokes' in the rest of the house plan, we're close."

Mae responded to Peter that day, "[o]nce you select Garic will immediately create a change order and then we will need a check for the amount he specified in the change order so he can purchase the lumber package immediately." A week later, Dirk sent the updated plan design to the Bauers and Garic, stating "I realize the plans are a little over the target SF on the First floor but I think this is very close and hope for some suggestions on where it is possible to shrink to meet the target."

The parties continued to exchange emails and attach draft plans. On August 23, 2021, Felicity emailed Peter to advise him that Garic had "re-adjusted" the price of the project from $755,200 to $759,300 to reflect the cost to build the revised design plans Dirk sent to Garic as of

7

August 20, 2021. Additionally, Felicity reiterated that "this price will require pre-paying the lumber package as discussed, in order to secure that low lumber cost that we have access to right now." Dirk and Peter again exchanged emails and draft plans over August 23-24, 2021. In the early afternoon on August 24, 2021, Felicity contacted the Bauers to set up a meeting that evening to finalize everything.

Sometime on August 24, 2021, the Bauers delivered a check to GHGC in the amount of $134,059 to purchase lumber for the construction of their house. Later that evening the Bauers emailed a computer link to Felicity regarding roofing ideas for the house. The next day, however, the parties agreed to cancel the Bauers' check and Peter wired the money to the company for the additional deposit.

### E.      Construction begins.

Despite the lack of completed plans, the parties decided to break ground and move forward with demolition and excavation at the project site and the pouring of the foundation. The Bauers and Mae met the excavator at the project site on September 1, 2021, to go over the process. This included what areas of the property needed to be cleared. The parties also discussed how and where various features such as the house, the driveway, and the septic system would be situated. The demolition and excavation work began sometime between September 10 and September 13, 2021.

After excavation was completed, the Bauers emailed Felicity and Erin on September 13, 2021, to inquire when Garic would be: (1) meeting with them on site to go over staking the property for the pouring of the foundation; and (2) meeting to review blueprints and drawings regarding details such as "roof lines, elevations, window/door/slider sizes and types." Felicity responded that Garic would let them know when the foundation/concrete subcontractor was ready so that everyone could meet on site to place the basement/foundation corners. As for the design questions, Felicity explained: "our drafter just does basic elevation sketches that will outline the basic shape and dimensions, but not necessarily the architectural elements of

homes...." As for specific architectural elements that the Bauers had expressed their desire to incorporate, Felicity said she would need to check with Garic to "see how we address getting those elements the way you like them." Regarding the roofline issue, Felicity commented: "I will find out about the approval process for the rooflines as well, I am unsure if that is something Dirk will draw in detail, or if we get those plans from the truss manufacturer who designs them—let me find out."

On September 21, 2021, there was an exchange of phone calls and emails regarding the foundation. The Bauers were advised that the subcontractor was ready "to put stakes down," but they expressed concerns that while they wanted to move quickly, they also wanted to proceed correctly. They also were concerned that Garic and Mae were leaving town soon and wanted to meet on site "to ensure the lot is set up correctly for the foundation pour[.]" Felicity replied by email, letting the Bauers know that she would meet with them and the subcontractor on site the next day.

During the same period, the parties continued to go back and forth regarding various design details, including versions of "concept drawings" concerning roofline details. The parties also began discussions for upgrading the Bauers' windows from standard white windows to upgraded black windows. Felicity passed along Garic's pricing for two different options and asked the Bauers to get back to her within a few days because Garic was ready to place the window order, which took a long lead time for delivery.

Sometime between September 22, 2021, and October 5, 2021, the foundation was poured. By all accounts, it was not poured correctly. According to the Bauers, the job was incorrectly staked, which led to mistakes in the orientation and positioning of the foundation. Garic blamed the subcontractor for the incorrect pour. The Bauers contacted Mae to meet in person at the site with Garic on October 5, 2021, to address the mistakes with the foundation. The Bauers and Garic exchanged emails and calls over the next couple of days to address the fixes needed to the

foundation, discuss the roofing, and an extensive list of standard features the Bauers wanted. The parties later met by video on October 13, 2021, to further discuss the matter.

During the end of October or early November, some work was done as to the walls and backfilling the basement foundation. On November 7, 2021, the Bauers emailed Felicity:

> Other than [Felicity's October 28, 2021, two-sentence email regarding the need to "backfill" the work area so that the foundation remediation work could occur], we haven't heard anything from anyone since our Oct 13th Zoom, so we did email Dirk this evening with the actual to-date basement foundation dimensions and a request for his next plan revision, including 3D roof view and more complete dimensioning than we've seen in prior concept drawings.

> As excited as we were Friday evening to see progress [backfilling], we have to say that **work should be paused until we have gone through the red-line process with dimensioned plans**.

(Emphasis added).

By mid-November, the Bauers were concerned that virtually all of their contact during this period was with Felicity and not Garic. According to the Bauers, Dirk had sent them some drawings but none of those were complete. The Bauers also wrote: "It is REALLY important that we have a reasonable amount of time to review and red-line Dirk's latest drafting (even if not complete) BEFORE they lay any more foundation. So the sooner we can start reviewing, the less likely we are to either end up with further construction delays and problems."

As time went by, however, Dirk stopped taking direction from the Bauers. Instead, he insisted that the Bauers needed to go through Garic before anything further could be done on the plans. This increased the Bauers' frustration with the project as Peter noted to Felecity that as of December 1, 2021, it had been seven weeks without hearing directly from either Dirk or Garic. Garic responded on December 3, 2021, advising Peter that he had received and marked up Dirk's latest plans. Garic forwarded the revised plans to Peter the next day, prompting a further exchange of emails. These included Peter's request that the drawings include the interior dimensions and his statement that "[w]e are amenable to reworking the roof if needed."

In response to these emails, on December 13, 2021, Dirk responded that he "left the interior dimensions off as I did not want to confuse the plan with them as my understanding was that the push is to get the foundation dimensions confirmed/approved." Peter responded that same day, stating "[a]s we expressed to you on the phone this evening, we are beyond frustrated and disappointed." His email continued:

> Garic and Mae asked us to wait a few days for a fully documented set of architectural drawings that we could redline. As of today, we've been waiting for TWO MONTHS and counting. This Dec 3rd version is a marginally revised, still incomplete, rough draft drawing. We also emailed Dirk separately on Nov 7th asking for dimensioned drawings and 3D views of the proposed rooflines, even if incomplete. As usual we got no reply.
>
> While we have been waiting for a complete set of drawings, we have been compiling red line comments based on what info we did have. As you read our notes, it'll be obvious that the entire list of concerns could have been addressed in the next couple of weeks after our [October 13, 2021] Zoom meeting.
>
> Even if Dirk and/or Garic start communicating with us immediately, we don't believe it is possible to close on a final set of plans in the next couple of days. No plan, no construction.[4]

Peter ended the email acknowledging receipt of Dirk's response but stating that they were still awaiting "'real' drafting products." A couple of hours later, Peter advised Garic and Dirk that "mutually signed plans are absolutely required before any further construction ... If the upcoming drawings are significantly more detailed than previously, we'll take them. If not, just stand by."

---

[4] Peter's December 13 email seems to be directly in response to an email from Dirk to the Bauers also dated December 13, 2021, entitled "Builders plans draft," with which he evidently forwarded revised plans but which he acknowledged did not contain interior dimensions. Dirk also informed the Bauers that the concrete plants would be shutting down for roughly a month within the next couple days. According to Dirk, the included plans only contained foundation dimensions in the hope that those could be immediately approved, so that the foundation subcontractor could re-pour the foundation before the concrete companies shut down for the holidays. Dirk also responded to Peter's December 13 email on December 14, 2021. He denied that anyone was ignoring the Bauers and also attempted to explain how he had reasonably responded to all of the Bauers' earlier questions and concerns.

Email communication continued between Felicity and the Bauers in early 2022. In February, Felicity suggested that the Bauers might want to consider hiring a different draftsman or an architect at their own expense to complete their plans. She pointed out that Garic believed Dirk's drawings met his needs to complete the project (provided the Bauers approved them), but she conveyed that Garic understood if they were unhappy with Dirk's plans and wanted to bring in their own plans prepared by someone else. Over the next couple of weeks, Felicity shared with the Bauers a handful of references for architects that Garic had worked with in the past and would recommend. The Bauers indicated that they would look into getting their own drawings. After that, there was some sporadic communication in August and September of 2022, regarding an unpaid surveyor who was attempting to collect directly from the Bauers. It is unclear whether or how that matter was resolved. The Bauers also asked if GHGC was still interested in building their house, stating that they now had a complete floor plan but still needed to hire an architect to create a full set of drawings.

In January 2023, the Bauers inquired about whether Garic's contracting company was prepared to build the house as contracted if the Bauers provided them with a complete set of plans. In response, Garic asked to see the plans. The Bauers expressed concern about incurring the cost of architects and other professionals to finish the design work unless Garic verbally committed to finishing the job. It is not clear how Garic finally responded but the Bauers began consulting with an architect and other professionals. In an email dated March 3, 2023, with Ace Concrete, Peter explained: "We stopped construction because Garic was trying to build without having finished drawings and the project was seriously going off the rails."

The Bauers consulted with professionals and focused on the defects in the existing foundation to determine whether they were remediable or whether the existing foundation needed to be demolished and the foundation re-poured from scratch. The architect, with the assistance of other professionals, conducted a survey of the existing work and produced a report concluding that the existing foundation was not salvageable.

In March 2023, Garic and Peter unsuccessfully sought to schedule an in-person meeting to discuss the project. After that, through written communications, Peter shared with Garic the results of the foundation survey. Garic disputed the results. He claimed that the survey was based on Anchorage building codes rather than those applicable in Wasilla and Palmer. According to Garic, the existing foundation passed an inspection conducted by an "independent IRC inspector." Garic also expressed the concern that "you abruptly stopped the project then and essentially disappeared for months." Garic then advised Peter that any future correspondence should be directed to his attorney.

### F.    GHGC's financial difficulties.

Both Garic and Mae acknowledged at trial that GHGC was experiencing cash flow problems during Covid in the summer of 2021, when the company entered into the contract with the Bauers. They also conceded that their handling of the company's finances was far from ideal—as money was commingled from multiple businesses and projects. They candidly admitted that they were often paying whatever bills immediately needed paying to keep everything afloat. At the same time, they credibly expressed their belief that in 2021 the contracting company could address its financial troubles. Garic detailed his efforts that summer to procure several working capital loans, as well as Covid loans, to continue the contracting business. Additionally, the Hayeses mortgaged their house to support the business. As Garic stated, he was still paying his bills and successfully completing projects through 2022.

The Bauers presented a much different account of GHGC's finances at trial. They discovered that GHGC had been in financial difficulty prior to the date of their construction contract. The Bauers believe that in light of the financial problems, Garic and Mae never really intended to build their house or purchase the lumber for the Bauers. Instead, they claim that the Hayeses induced them to pay the two deposits solely for the purpose of obtaining the Bauers' money on false pretenses to use for other purposes. In support of their argument, they rely on the testimony of Kamiko Newsom and an audio recording she provided of a meeting in early July

2021 with Mae. During this meeting, Mae admitted to Kamiko that the contracting company was roughly $500,000 to $1,000,000 in debt. Mae also admitted that monies from multiple revenue sources—including Garic's contracting company—were being "commingled" to pay the bills. According to Mae, she and Garic did not have the luxury of keeping finances separated under these financial conditions.

As it turned out, GHGC failed. The Hayeses lost their house and ended up filing personal bankruptcy in May 2024. This adversary proceeding followed.

**Analysis**

**A.    Preliminary matters.**

The Bauers contend that Garic and Mae Hayes fraudulently induced them into entering the construction contract with GHGC and making the initial payment as well as the subsequent payment to purchase lumber. Their claims sound in fraudulent misrepresentation as to GHGC's ability and intent to build their house. But the Bauers contracted only with GHGC. The Hayeses cannot escape personal liability, however, for their tortious actions. Corporations and other business entities only act through their employees and agents as a matter of general agency law. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015) (citing *Suez Equity Invs., L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)). When an agent commits a tort such as fraud and causes the principal to enter into a contract with the third party, the agent is subject to liability for the fraud committed. Restatement (Third) Of Agency § 7.01 & comment b thereto (2006). Garic and Mae remain personally liable for any torts for which they are responsible or participated in as agents of GHGC. *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) ("corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1986))); *3685 San Fernando Lenders, LLC v. Compass USA SPE, LLC (In re USA Com. Mortg. Co.)*, 802 F. Supp.2d 1147, 1165 (D.

1    Nev. 2011) ("As managing members of Compass, Piskun and Blatt are personally liable for

2    engaging in the conversion that plaintiffs proved was committed by Compass.").

3        It is undisputed that Garic acted as GHGC's agent on the Bauers' project. In contrast, the

4    parties have spent a significant amount of time arguing over Mae's involvement. She was not a

5    party to the contract and does not have any ownership interest in Garic's company. Yet, in this

6    instance privity of contract is largely irrelevant. She consistently acted on GHGC's behalf

7    throughout the construction project and played a pivotal role in procuring the funds from the

8    Bauers. During that process, Mae and Garic both made representations or promises to the Bauers

9    regarding GHGC. Both acted on behalf of GHGC while negotiating the Bauers' contract and

10   obtaining the original deposit as well as the funds for the purchase of the lumber. Both, therefore,

11   may be held liable to the extent they each separately fraudulently induced the Bauers to pay the

12   two deposits.

13       **B.    The Bauers' fraud claims.**

14       Because the Hayeses' underlying liability was not liquidated prepetition, the court must

15   engage in a two step process: first it must determine whether a debt exists under applicable law,

16   and second, whether the debt is excepted from discharge under § 523(a). *Banks v. Gill Distrib.*

17   *Ctrs., Inc.,* 263 F.3d 862, 868 (9th Cir. 2001); *see also Schindler v. Milliron (In re Milliron)*,

18   2021 WL 4515239, at *8 (Bankr. D. Alaska Sept. 30, 2021). The underlying fraud claims are

19   governed by Alaska law while the nondischargeability claims under § 523(a)(2) are governed by

20   federal law. *See Banks*, 263 F.3d at 868. If the Hayeses are not individually indebted to the

21   Bauers under Alaska law, the second step becomes unnecessary. *Gidelski v. Anton (In re Anton)*,

22   2013 WL 1747907, at *2 (Bankr. E.D. Mich. Apr. 12, 2013). Fortunately, the elements to except

23   a debt from discharge for fraud under § 523(a)(2)(A) largely mirror those required to state a

24   claim for fraud under Alaska law. *In re Milliron*, 2021 WL 4515239, at *8.

25       Section 523(a)(2)(A) excepts from discharge debts incurred through "false pretenses, a

26   false representation, or actual fraud." To establish actual fraud under § 523(a)(2)(A), a creditor

must prove by a preponderance of the evidence each of the following elements: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." *Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009), *aff'd*, 407 F. App'x 176 (9th Cir. 2010) (quoting *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000)). The elements for fraud under Alaska law are functionally the same. *Deloycheet, Inc. v. Beach (In re Beach)*, 570 B.R. 300, 325 n.162 (Bankr. D. Alaska 2017) (citing *Jarvis v. Ensminger*, 134 P.3d 353, 363 (Alaska 2006)). It bears repeating that negligence in making a misrepresentation may support liability, but it does not suffice to except the debt from discharge under § 523(a)(2)(A). *Mortg. Guar. Ins. Corp. v. Pascucci (In re Pascucci),* 90 B.R. 438, 444 (Bankr. C.D. Cal. 1988); *Ries v. Sukut (In re Sukut),* 357 B.R. 834, 840 (Bankr. D. Colo. 2006).

Because the circumstances surrounding the two deposits differ, the court will consider each deposit separately.

### 1.    Initial deposit of $190,500.

The Bauers paid $190,500 to GHGC as the initial deposit for the construction of their house. The record reveals no separate inducement to pay the deposit apart from entering the construction contract. Accordingly, the claim is really one for fraudulent inducement to enter into the construction contract. The Bauers contend that Garic and Mae knowingly and intentionally misrepresented GHGC's intent to build the house. There is no dispute that Garic and Mae represented GHGC had the ability and intent to build the Bauers' house. Nor is there any dispute that the Bauers justifiably relied on the Hayeses' representations regarding GHGC's ability and intent to build their home. It is also undisputed that GHGC failed to build the Bauers' custom house resulting in a breach of GHGC's contract that has damaged them. Thus, the Bauers

have established the elements of justifiable reliance and damages in support of a claim for fraudulent misrepresentation. However, they have not established the first three elements by a preponderance of the evidence.

In this instance Garic and Mae directly and indirectly represented that GHGC had the ability and intent to build the Bauers' house. The question is whether they misrepresented GHGC's ability or intent with both the knowledge the representation was false and the intent to deceive. "Both the knowledge and intent elements under § 523(a)(2)(A) may be established by circumstantial evidence and inferences drawn from a course of conduct." *Hirth v. Donovan (In re Hirth)*, 2014 WL 7048395, at *10 (B.A.P. 9th Cir. Dec. 11, 2014) (citing *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 66 (B.A.P. 9th Cir. 1998)). Courts have generally accepted the Restatement's definition as to what suffices for knowledge of the false representation: "[a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch),* 237 B.R. 160, 168 (B.A.P. 9th Cir. 1999) (quoting Restatement (Second) of Torts § 526 (Am. Law Inst. 1977)).One may, therefore, knowingly make a fraudulent representation "without knowledge of its falsity, if the person making it 'is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented.'" *Id.* (quoting Restatement (Second) of Torts § 526, cmt. e).

Recklessness may also be probative of an intent to deceive. However, "recklessness alone does not equate to fraudulent intent." *In re Hirth*, 2014 WL 7048395, at *11. Rather, it must be viewed within the totality of the relevant circumstances. *In re Gertsch*, 237 B.R. at 167–68; *see also Gotcher v. Duffie (In re Duffie)*, 531 B.R. 847, 858 (Bankr. D. Mont. 2015), *aff'd*, 2017 WL 5473879 (D. Mont. Nov. 14, 2017), *aff'd*, 801 F. App'x 572 (9th Cir. 2020). Even when considering a debtor's recklessness, "[t]he essential point is that there must be something about

the adduced facts and circumstances which suggest that the debtor intended to defraud creditors or the estate." *Khalil v. Devs. Sur. & Indem. Co. (In re Khalil),* 379 B.R. 163, 175 (B.A.P. 9th Cir. 2007). Ultimately, the court must determine whether the totality of the circumstances demonstrates an "overall impression of a deceitful debtor." *Skinner v. Huggins (In re Skinner),* 2014 WL 6981949, at *8 (B.A.P. 9th Cir. Nov. 20, 2014) (quoting *Nwas Okla., Inc. v. Kraemer (In re Kraemer),* 2011 WL 3300360, at *6 (B.A.P. 9th Cir. Apr. 21, 2011)).

Garic's and GHGC's ability to build the Bauers' house is not seriously in dispute. The fact that GHGC failed to finish the Bauers' house does not necessarily mean that they misrepresented their ability to do so. Garic had the requisite experience to build custom houses. He had done so through GHGC for several years before the Bauers' contract and had considerable experience in residential construction. Indeed, the Bauers contracted with GHGC because they had viewed some of the houses he had successfully built. In short, the evidence presented at trial demonstrated that Garic and Mae did not misrepresent GHGC's ability to build a custom house.

The Bauers also argue that Garic and Mae knowingly and fraudulently misrepresented their intent to build their house. They contend that neither of them had any actual intent to complete the construction. Again, at the time the Bauers entered into the construction contract with GHGC, the evidence amply demonstrates that Garic and Mae had the actual, subjective intent to build the custom house. "Partial performance, under the right circumstances, can be persuasive to counter a false promise allegation." *Snapir v. Breliant (In re Snapir)*, 2017 WL 5022354, at *5 (B.A.P. 9th Cir. Nov. 3, 2017). As the bankruptcy court in *Ward v. Decret (In re Decret)*, 2017 WL 4097813, at *2 (Bankr. C.D. Cal. Sept. 13, 2017) noted, "fraud may be inferred from an <u>immediate</u> failure to perform a promise, but initial performance in accordance with a promise negates any possible inference of fraud." (cleaned up) (emphasis in original) (quoting *Kaylor v. Crown Zellerbach, Inc.*, 643 F.2d 1362, 1368 (9th Cir. 1981)) .

GHGC took significant steps in furtherance of the construction of the Bauers' home. Considerable time and effort were spent drafting and revising the plans for the house in an effort to comply with the Bauers' requirements. The Bauers were never able to provide GHGC plans – because they were never satisfied with the drawings. This was not for lack of effort. As Dirk testified, he drafted numerous versions, considerably more than typically required for a house, even a custom house. The emails between the Bauers, GHGC, and Dirk reflect Peter Bauer's growing frustration with completion of the plans culminating in December 2021, after which time the project essentially stopped at Peter's instruction.

It is clear that the failure to finalize the plans substantially impacted the construction project in multiple negative ways. As discussed further below, it prevented Garic from ordering the lumber package. The failure to finalize the plans also delayed the pouring of the foundation. Yet, GHGC was willing to proceed to excavate and clear the property and lay the concrete foundation without completed plans. This was presumably done in an effort to comply with the Bauers' desire to complete construction by March 2022. Consistent with this, GHGC and the Bauers exchanged multiple emails between June and December 2021. These email exchanges reflect additional meetings and calls evidencing ongoing efforts to work through the delays and the construction problems.

The Bauers see the construction errors as evidence that Garic and Mae never intended to build their house and evidence of their fraudulent intent. Indeed, all parties admit that the foundation was improperly set by GHGC's subcontractor. Yet again, Garic and GHGC attempted to work through this with the Bauers. They remained in contact with the Bauers and attempted to resolve the issue. The Bauers discount the significance of these communications, pointing out that most of the contact was with Felicity rather than Garic and Mae. The court fails to see how this is probative of Garic's and Mae's knowing fraudulent intent at the making of the contract.

In support of their fraud claims, the Bauers rely heavily on Kamiko Newsom's conversation with Mae in early July 2021. They see the conversation as the proverbial smoking

gun establishing a knowing and fraudulent misrepresentation of GHGC's intent not to build their house from the inception. Much was made of Mae's statements to Kamiko that "[w]e're down like 500 to $1 million upside down." Mae also told Kamiko during the conversation that the company had no revenue and had been "in the red" for months.

It is clear Mae understood that GHGC was in financial trouble. Indeed, that was the reason GHGC had hired Kamiko– to address the company's lack of proper accounting and controls. Kamiko clearly had problems with the company's financial management and accounting systems. But GHGC hired her to help fix its financial problems, not to hide them. The discussion suggests that the problems with GHGC's financial controls and record-keeping were more than Kamiko anticipated. But the court does not take Mae's discussion of GHGC's financial condition as evidence of any knowing or fraudulent misrepresentation of GHGC's ability or intent to build the Bauers' house.

Nor does the court take Mae's statements as to GHGC's financial condition literally as the Bauers ask the court to do. Despite Mae's wide-ranging discussion of GHGC's financial condition in July 2021, no specific financial data was presented or referenced at that time. Nor did either party present any financial analysis at trial. Based on Mae's trial testimony and a review of the transcript of Mae's discussion with Kamiko, the court does not consider Mae's comments to be a literal statement of the company's financial position at that time. Mae was a real estate broker and appraiser. There is no evidence that Mae had any training in finance or accounting, or any specific role with GHGC in those areas. Both her discussion with Kamiko and the trial testimony reflect Mae's general understanding that GHGC was struggling financially and lacked adequate controls and accounting. But they also reflect a lack of precision and detail. Indeed, Garic testified that Mae did not know everything about the company's finances and that he did not believe GHGC was "contractor insolvent" at the time Mae had her discussion with Kamiko. While he never defined what he meant by that term, he described the financial nature of the construction business as "kind of terrifying" where the bills mount before payments on jobs

are received. Moreover, GHGC could not have operated if it was constantly accruing a monthly deficit of $500,000 or more and had no revenue as Mae stated. GHGC's bank statements admitted at trial reflect that the company had roughly $3 million in revenue between July and December 2021, the only months for which bank statements were submitted as evidence:

|  | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 |
|---|---|---|---|---|---|---|
| Beginning Balance | $ 9,152.89 | $ 49,425.66 | $ 146,163.38 | $ 6,187.81 | $ 68,896.03 | $ 102,960.23 |
| Additions | $ 732,431.49 | $934,369.68 | $ 179,548.31 | $ 545,274.06 | $ 443,894.68 | $ 126,681.83 |
| Less | $(692,158.72) | $(837,631.96) | $(319,523.88) | $(482,565.84) | $(409,830.48) | $(240,135.45) |
| Ending Balance | $ 49,425.66 | $146,163.38 | $ 6,187.81 | $ 68,896.03 | $ 102,960.23 | $ (10,493.39) |

The problem for GHGC was that it spent slightly more than this amount over the same period. In light of the overall evidence, including the bank statements, the court takes Mae's conversation to mean that she understood GHGC did not generate enough monthly income to pay all of GHGC's obligations on a monthly basis and, more importantly, the timing of the payments on its projects was problematic. This is consistent with Mae's repeated references to GHGC's cash flow problems during her conversation with Kamiko. For these reasons, the court declines to apply Mae's statements regarding GHGC's finances literally.

Financial difficulties, and even insolvency, do not automatically equate to a knowing and fraudulent intent to misrepresent GHGC's ability and intent to construct the Bauers' house. *See Kunda v. Shaul (In re Shaul)*, 579 B.R. 231, 242-43 (Bankr. D. Or. 2017) ("The testimony did establish that debtors were experiencing financial distress during the course of [debtors'] dealings with plaintiff, including when they entered into the agreement and while the work on the project was on-going. That fact alone does not demonstrate an intent to deceive…."). Clearly, GHGC's finances were not good. But again, Garic and Mae were trying to address those issues, not take advantage of them. They candidly admitted that they were not observing the distinctions between themselves and their business entities during this time given all that had transpired in

the prior Covid months. They hired Kamiko to reform GHGC's accounting and implement the necessary financial controls. The transcript of Mae's discussion with Kamiko makes this clear. It is also clear that Mae understood this would be a significant task.

While GHGC was attempting to improve its accounting and financial controls as of July 2021, Garic was actively looking and applying for additional financing to address GHGC's cash flow problems. Garic testified that he sought working capital loans for GHGC and was working to acquire financing from Finance of America, which financed at least two GHGC construction projects. He also testified that he applied for the Covid era loans, including the Paycheck Protection Program (PPP), and a government loan for $365,000 which was deposited the same day as the Bauers' second deposit. In December 2021, Garic and Mae mortgaged their home to secure repayment of a $300,000 loan from the Plooy 2000 Trust, which had financed a number of GHGC's construction projects. Garic testified that these loan proceeds were used to help fund GHGC. This testimony was not contested.

On the other hand, the Bauers see GHGC's poor financial management as evidence of fraudulent intent. It can be – typically when the principals of the company are draining assets for their personal benefit at the expense of its creditors. The Bauers point to the Hayeses' use of GHGC monies to pay their personal expenses as evidence of wrongful behavior indicative of fraudulent intent. The Hayeses admit to using GHGC funds to pay their personal expenses. Yet, this must also be put in context. Garic testified that he did not take a salary from GHGC. Nor did Mae. They should have. But this merely further confirms GHGC's lack of proper accounting and controls that Kamiko was hired to address.

The parties have failed to offer any analysis of the personal payments from GHGC. The company's bank statements in evidence include numerous debits in small amounts, including restaurants and various entries that may well be for personal expenses. But without any further evidence or analysis of those charges, the court cannot tell how much of GHGC's money was used to pay for the Hayeses' personal expenses. As such, the court has no sense whether the

payments deviated materially from what Garic's reasonable salary should have been. While not condoning this activity, the court cannot, and does not, find that this alone is evidence of fraudulent intent to knowingly misrepresent GHGC's ability or intent to build the Bauers' house. Consistent with these problems, but further complicating the court's analysis, Mae acknowledged that her income from other sources was also commingled into GHGC's account. She testified that contrary to demonstrating their fraudulent intent, she and Garic did this to put money *into* GHGC from her earnings, including their family's Alaska permanent fund dividends. This testimony was not contradicted.

The court can appreciate the Bauers' point of view. They deposited money into a struggling company. Construction on their house was delayed. Once it began further problems occurred. All of this culminated in GHGC's failure to build their house and the loss of their deposits. But the Hayeses offer another version of events. GHGC was having cash flow problems coming out of Covid in 2021, but it took loans to establish working capital and started new jobs to correct those problems. Shortly before the Bauers' contract, GHGC hired Kamiko Newsom to fix its financial management and accounting. The Bauers' job was a promising part of that process as it was self-financed and was to be completed by the spring of 2022. GHGC took the job seriously and was ready to begin but the job never really got off the ground. This was not due to lack of money on GHGC's part, but because the Bauers never finalized their design plans. All parties believed they were close to finalizing the plans in August, when they amended the construction contract to add additional square footage while taking advantage of falling lumber prices. But the parties were never able to finalize those plans. The Bauers became frustrated with Garic and GHGC and halted the project in December 2021. GHGC continued with other projects until late 2022. Even then, the parties considered continuing the project as Garic was attempting to arrange additional financing with Finance of America, which GHGC had begun to use.

Both scenarios are plausible. But the Bauers bear the burden of proof. *Slyman*, 234 F.3d at 1085. The parties' testimony generally tracks the events corroborated by the emails admitted

into evidence. This includes the failure to finalize the design plans. To state the obvious, they differ in the inferences to be drawn from these facts. Ultimately, the court concludes and finds that the failure to finalize the design plans, including the frustration it caused, was the determinative event in this instance, not GHGC's financial problems. According to Dirk, the designs should have taken a month to complete, maybe two. The emails show that GHGC anticipated getting the foundation in much earlier than it happened, and then it did so without finalized plans. Late August appears to have been the pivotal point for the project when all the parties were hopeful the plans would be finalized, the lumber package purchased, and construction begun. After that, the emails show, and the trial testimony confirmed, that the relationship between the Bauers and GHGC began to deteriorate. Certainly, the problems with the foundation contributed to the deterioration of their relationship. Still, the emails and testimony reveal that both sides were genuine in their efforts to move forward.  However, the Bauers remained dissatisfied with the design plans and became increasingly frustrated with the foundation problems. Dirk and Garic became increasingly frustrated with numerous and continuing changes and the Bauers' detailed requirements. All of this culminated in the email exchanges in December 2021, leading the Bauers to place the project on hold. Despite some mild efforts to restart the project, neither side was able to overcome their frustrations by that point.

The court finds Garic's testimony credible. His account of the events and explanations are consistent with the documentary evidence – both as to GHGC's financial condition and the project. Importantly, the court further credits Garic's and Mae's testimony that they were attempting to address GHGC's financial problems rather than run from them or take advantage of the situation. This, together with GHGC's efforts to construct the house, and address the problems that arose, are strong evidence against any knowing misrepresentation and fraudulent intent. When GHGC entered the construction contract, the relevant time for the Bauers' fraud claim, Garic and Mae believed that GHGC could and would be able to perform the contract. GHGC's efforts through the end of 2021 support this conclusion. Ultimately, GHGC breached its

contract, but the evidence fails to show that either Garic or Mae knowingly and fraudulently misrepresented GHGC's ability or intent to perform the contract.

For these reasons, the court holds that the Bauers have failed to carry their burden to prove that the Hayeses made a false statement or false promise with respect to the initial deposit regarding GHGC's ability and intent to perform, or that they did so with knowledge of the falsity or intent to deceive. Therefore, the Bauers have failed to establish their claim for fraud to hold the Hayeses liable for the initial deposit of $190,500 or except that debt from discharge under § 523(a)(2)(A).

### 2.      Additional deposit of $134,059.

Roughly two months after entering the contract and paying the initial deposit, the Bauers amended the contract and paid an additional deposit of $134,059. The parties agree that this payment was made so that GHGC could take advantage of a drop in lumber prices, which had risen significantly during the Covid pandemic. Indeed, it appears that Peter Bauer first proposed the idea to Garic as part of an effort to expand the square footage of the house. Garic worked up several options. The Bauers selected an option and the parties executed Amendment No. 1 to the Residential Construction Agreement on August 24, 2021. The Amendment expanded the square footage of the house while reducing the total purchase price by a minimal amount. Yet, the Amendment required an additional deposit of $134,059, to enable GHGC to purchase the lumber necessary for the construction.

In essence, GHGC committed to take the risk as to the cost of the additional construction in exchange for the additional deposit. Both Garic and Mae made statements that the additional deposit would be used to purchase the necessary lumber for the project. No lumber was actually purchased for the Bauers' construction. For this discussion, the court assumes that: (1) the Bauers relied on Garic's statements that the additional deposit would be used to purchase the lumber package for the construction; (2) based on this reliance, the Bauers were induced to enter into the contract amendment and pay the additional deposit; and (3) as a result, they ultimately

lost the amount of the additional deposit when the contracting business failed without having ever built the Bauers' house. Again, the question becomes whether Garic and Mae knowingly and fraudulent misrepresented the use of the additional deposit.[5]

Garic credibly testified that completion of the design plans—and the Bauers' approval of them—was an "obvious" prerequisite to purchasing the lumber needed to build the Bauers' house. Without completion of the design plans, Garic testified that he was unable to calculate the amount of lumber to purchase – including the appropriate roofing trusses. The parties' emails reflect continuing discussions and disagreement concerning the roofing, beginning around this same time. But, as discussed above, the parties' contemporaneous email correspondence surrounding the discussion of the additional square footage and execution of the Amendment, shows that everyone anticipated the design plans would be promptly completed and approved. This evidently led everyone to believe that the design plans would not become a significant impediment to purchasing the lumber. But they clearly did.

The record is equivocal regarding whether the Bauers knew and understood that the lumber for their house could not be purchased until the design plans were completed and approved. At trial, Garic testified that "everyone" understood that no lumber could be purchased absent finalized plans. Peter acknowledged at trial that GHGC could not purchase the trusses without the final design plans, but he argues that GHGC should have purchased some lumber. Again, GHGC did not purchase any lumber.

This claim presents a close question given the additional deposit arose as part of a specific effort to lock in the lumber costs for the construction. But it remains the Bauers' burden

---

[5] The Bauers draw no distinction between Garic's statements and the separate statement(s) that Mae made regarding the additional deposit. A plaintiff must prove fraud as to each defendant. *Capp Equities, LLC v. Christine (In re Christine)*, 429 B.R. 882, 887 (Bankr. W.D. Mich. 2010). The court has concerns as to whether the Bauers have proven that Mae knowingly and fraudulently made a misrepresentation as to the additional deposit given her limited role in the Amendment. Her involvement seems to be limited to one confirmation email sent to the Bauers on August 13, 2024, after Garic's representation.

to prove by a preponderance of the evidence that Garic's statements regarding the use of the additional deposit were false or misleading. The exact relationship between the lumber purchase and the completion of the plans remains unclear. The design plans were never completed and approved. And the parties agree that there was no certainty as to the correct trusses to order. In fact, on October 3, 2021, Peter wrote to Felicity:

> We didn't really care for the roof line drawings; they are quite a departure from the craftsman example picture from online that we shared with you. Not our strong suit, but we're doing the best to sketch it out. Accordingly, we strongly recommend that you DON'T order trusses until we have signed final drawings.

This supports Garic's explanation that GHGC could not order the lumber package for the project until the design plans were finalized – which everyone originally believed would happen quickly at the time they amended the contract and the Bauers paid the additional deposit. The evidence presented by the parties does not go into detail as to why this did not occur – but it appears that all parties had a role in it. For the reasons explained above, the court finds that the significance of the parties' failure to complete the design plans should not be understated. The Bauers played a significant role in that delay – together with GHGC. Based on the emails and testimony, the court concludes that the problems or disagreements as to the plans were genuine rather than any part of a scheme to defraud the Bauers. And the inability to finalize the plans had consequences for the construction project including the delay of GHGC's lumber purchase.

This leaves the court again with two equally plausible arguments supported by the evidence. The court credits the Hayeses' explanation as to why the lumber package was not purchased. Others may well disagree with this finding. But even if the court did not credit the Hayeses' explanation, it cannot find that the Bauers established that it is more likely than not that Garic (or Mae) made the statements concerning the additional deposit and entered into the Amendment knowing and intending *at that time* that GHGC would not use the funds to purchase the lumber and fraudulently intending to deceive the Bauers. Accordingly, the Bauers have failed

to establish all the elements to support the underlying claim for fraud and to except from discharge the debt arising from the additional deposit of $134,059.

### Conclusion

For the reasons set forth above, judgment shall be entered in favor of the Hayeses. The Bauers have failed to prove that either Garic or Mae Hayes defrauded them and the resulting debt owed should be excepted from discharge under 11 U.S.C. § 523(a)(2).

DATE:    September 22, 2025

_/s/ Gary Spraker_____
GARY SPRAKER
United States Bankruptcy Judge

Serve:  R. Crowther, Esq.
       G. Parvin, Esq.
       ECF Participants via NEF